

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00011-CR

_____

CURTIS MICHAEL PARKS, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. 61,049-A

Before Sudderth, C.J.; Bassel and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

Appellant Curtis Michael Parks purchased a lipstick-shaped vibrator and gave it to his 14-year-old stepdaughter T.J. (Tina)[1] with the intention of helping her masturbate. For this, a jury convicted Parks of attempted sexual performance by a child. *See* Tex. Penal Code Ann. § 43.25. Parks appeals his conviction, challenging (1) the sufficiency of the evidence to prove that his provision of the vibrator amounted to more than mere preparation, (2) the trial court's refusal to redact certain portions of Parks's video-recorded police interview, and (3) the constitutionality of the sexual-performance statute as applied to Parks's case. We will affirm.

## I. Background

The facts of the case are largely undisputed. Parks purchased a lipstick-shaped vibrator on Amazon, he gave it to Tina, and he showed her how to turn it on. He later explained that he had found a clay, carrot-shaped object in Tina's bedroom, that the handmade object was engraved with the word "Twinki,"[2] and that after some internet research, he had discovered that there was a German sex toy known as a twinkie. Parks claimed that, because he had found dirty underwear under Tina's bed

---

[1]To protect the minor victim's anonymity, we refer to her using an alias. *Cf.* Tex. R. App. P. 9.10(a)(3), (b).

[2]Tina later told Parks that she "had extra clay from ar[t] class and [she] didn't know what to do with it, so [she] rolled it up and wrote 'Twinki' on it. [She] ran out of room for an 'e'." When she testified, she told the jury that the object was "a piece that actually fell off of the original sculpture" when she made "a wolf statute" for her school art class.

in the past, he was concerned that Tina was using the clay object to masturbate unsafely, so he provided the vibrator as "a safer way."

Parks voluntarily discussed his case with police, and in a video-recorded interview, he admitted that he found Tina sexually attractive. Then, in response to a hypothetical question from the police, Parks indicated that if Tina were 18 years old, if his wife were out of the picture, and if Tina were to tell him that she wanted to have sex with him, he "probably" would not sleep with her although it would be a "tough judgment call."

The police searched Parks's phone, and that search—together with a search of Tina's phone—revealed that, in the months leading up to the vibrator incident, Parks sent Tina numerous questionable text messages, many of which alluded to sexual matters. Multiple law enforcement officials described Parks's text messages—and the actions that they referenced—as Parks "grooming" Tina for sexual abuse.

Parks was subsequently indicted for attempted sexual performance by a child by "purchasing a lipstick vibrator for [the] child to use for the purpose of masturbation and providing such item to the child." *See id.* §§ 15.01(a), 43.25(b). At trial, the primary contested issue was whether Parks intended to authorize or induce masturbation. Parks denied this intention and claimed that he was simply acting as a concerned parent by providing the vibrator for a bona fide educational or medical purpose. *See id.* § 43.25(f)(2). Parks alleged that the sexual-performance statute was unconstitutional as applied to him because the statute infringed on his parental right

3

to direct the sexual health and education of a child in his care. The State, meanwhile, argued that Parks had been grooming Tina for sexual abuse and that the provision of the vibrator was a step toward that goal.

After the evidence closed, the trial court denied Parks's as-applied constitutional challenge to the sexual-performance statute. The jury then convicted Parks of attempted sexual performance, rejecting Parks's affirmative defense that he had provided the vibrator for a bona fide educational or medical purpose. *See id.* § 43.25(b), (f)(2).

## II. Discussion

Parks raises three issues on appeal: (1) the sufficiency of the evidence to prove that his provision of the vibrator was an act amounting to more than mere preparation, (2) the trial court's refusal to redact the portion of his video-recorded police interview in which he responded to hypothetical questions about whether he would sleep with Tina if she were 18, and (3) the constitutionality of the sexual-performance statute as applied to Parks's purported exercise of his parental discretion.

### A. The evidence was sufficient.

First, Parks argues that the evidence was insufficient to support his conviction because his actions—purchasing a vibrator and giving it to Tina—amounted to, at most, mere preparation to commit sexual performance by a child. *See id.* § 15.01(a).

4

### 1. Sufficiency Standard of Review

In our review of the sufficiency of the evidence, we view all the evidence in a light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). The factfinder alone determines the evidence's weight and credibility; we may not usurp that role. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021); *Queeman*, 520 S.W.3d at 622.

### 2. Essential Elements of Attempted Sexual Performance by a Child

A person commits attempted sexual performance by a child "if, with specific intent to commit [sexual performance by a child], he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense." Tex. Penal Code Ann. § 15.01(a). A person commits the offense of sexual performance by a child if, "knowing the character and content thereof, he employs, authorizes, or induces a child younger than 18 years of age to engage in sexual conduct." *Id.* § 43.25(b). As relevant here, "[s]exual conduct" is statutorily defined to include "masturbation."[3] *Id.* § 43.25(a)(2). The terms "employ[]," "authorize[]," and

---

[3]"Masturbation" is not statutorily defined but is commonly understood to mean "erotic stimulation involving the genital organs . . . achieved by manual or other bodily contact exclusive of sexual intercourse, [or] by instrumental manipulation." *Masturbation*, Webster's Third New International Dictionary 1391 (2021).

"induce[]" are not statutorily defined, though, so the factfinder was free to interpret them according to their ordinary meanings. *See State v. Bolles*, 541 S.W.3d 128, 138 (Tex. Crim. App. 2017); *Kirsch v. State*, 357 S.W.3d 645, 650 (Tex. Crim. App. 2012).

The ordinary meaning of "authorize" is "to endorse, empower, justify, or permit by or as if by some recognized or proper authority." *Authorize*, Webster's Third New International Dictionary 146 (2021); *see Clemens v. State*, No. 05-17-00665-CR, 2018 WL 3121209, at *9 (Tex. App.—Dallas June 26, 2018, no pet.) (mem. op., not designated for publication) (noting that "one 'authorizes' conduct by empowering the actor or affording a right to act" (quoting *Ex parte Fujisaka*, 472 S.W.3d 792, 797 (Tex. App.—Dallas 2015, pet. ref'd))); *Franklin v. State*, 193 S.W.3d 616, 620 (Tex. App.—Fort Worth 2006, no pet.) (citing Webster's New World Dictionary and defining "authorize" as "1) to give official approval to or permission for; 2) to give power or authority to; 3) to empower or commission; or 4) to give justification for or warrant"). "[I]nduce," in turn, means "to move and lead (as by persuasion or influence)," or "to inspire, call forth, or bring about by influence or stimulation." *Induce*, Webster's Third New International Dictionary 1154 (2021); *see Clemens*, 2018 WL 3121209, at *9 (defining "induce" as "to move and lead by persuasion or influence" (quoting *Fujisaka*, 472 S.W.3d at 797)); *see Parker v. State*, No. 09-16-00061-CR, 2017 WL 1424946, at *4 (Tex. App.—Beaumont Apr. 19, 2017, no pet.) (mem. op., not designated for publication) ("The term 'induce' is not defined by the statute,

6

but Texas courts have used its commonly understood meaning of 'to move and lead by persuasion or influence.'" (quoting *Fujisaka*, 472 S.W.3d at 797)).

It is an affirmative defense to sexual performance by a child "[that] the conduct was for a bona fide educational [or] medical . . . purpose." Tex. Penal Code Ann. § 43.25(f)(2).

### 3. Evidence of Parks's Actions

From Parks's perspective, all he did was buy Tina a vibrator, give it to her, and show her how to turn it on. According to Parks, he merely created the opportunity for Tina to masturbate—he never directed Tina to do so.

When Parks's actions are considered in context, though, a rational jury could have concluded that Parks's provision of the vibrator tended but failed to "authorize[]" or "induce[]" Tina to engage in sexual conduct. *Id.* § 43.25(b). The evidence—viewed in a light most favorable to the verdict, *Queeman*, 520 S.W.3d at 622—showed that (1) Parks exhibited grooming behaviors in the months before the vibrator incident; (2) even before he gave Tina the vibrator, Parks repeatedly sent Tina text messages alluding to sexual matters; (3) Parks then gave Tina the vibrator for the purpose of sexual stimulation, *see* Tex. Penal Code Ann. § 43.21(a)(7); (4) after he gave her the vibrator, he sent additional sexual text messages referencing and asking about the device; and (5) Parks later admitted to the police that he found Tina sexually attractive and that—assuming his wife were out of the picture, Tina were over the age

7

of 18, and Tina had expressed interest in him—it would be "a tough judgment call" as to whether he would have sex with her.

### a. Grooming Behaviors

The State's theory of the case was that Parks had been grooming Tina for sexual abuse, and the State presented a significant amount of evidence to support this theory.

Three separate witnesses testified to the meaning and danger of grooming. A detective trained in crimes against children explained that grooming was "the early process of a predator establishing rapport and trust with a child victim leading up to sexual abuse." An investigator with Child Protective Services (CPS) gave the jury a similar description of "grooming" as "the building of a relationship or an emotional-type connection with a child for the purpose of manipulating and ultimately abusing a child." And a licensed professional counselor noted that, although grooming often involves "innocuous-looking behavior," a "cluster" of such behavior is targeted at a child to shower the child with favor, isolate the child from family members and encourage the child to "keep the secrets from everybody else in the system."

Both the detective and the CPS investigator confirmed that Parks's text messages and behavior were indicative of grooming. The detective noted that Parks was giving "special treatment towards one child over the other"—he "was offering [Tina] an allowance that he wouldn't give to [Tina's brother (Brother)]," he was "giving her a tablet telling her she can pick out whatever presents she wants and he'll

8

give it to her," and he "was sending her the late[-]night messages telling her that this would be a secret between us." The CPS investigator similarly testified that Parks's text messages telling Tina that "he would buy anything that [Tina] wanted," that he would "provide[] [her] with money that he did not provide to [Brother]," and that "nobody else would have to know" were all examples of grooming behaviors.

The jury was able to evaluate Parks's behavior for itself as well, and the evidence bore out the grooming behaviors that the detective and investigator described:

- Tina testified, and Parks's text messages confirmed, that Parks repeatedly offered to buy Tina things and even created a separate account on Amazon "specifically for [Tina] to use for anything that [she] might want off of Amazon."

- Tina and Brother were only 14 months apart in age, and Tina testified that they were close and that they were protective of one another. But Parks's text messages revealed that he repeatedly sent Tina text messages insulting Brother, calling him "a dweeb," and referencing "his lies and bull sh**." Parks even offered to give Brother's pet to Tina "if [Brother] drops the ball[]."

- Parks offered to provide Tina money if she would "[kee]p it a secret from [Brother]." Tina told the jury that the money made her feel uncomfortable "because [she] was getting money for no reason and [her] brother wasn't."

- Parks sent Tina text messages telling her that she could stay awake when Brother was being forced to go to bed. For example, in one message, Parks told her, "[b]ed time is 2:30[,] unless you want to stay up later[.] [Tina] sets her rules[,] not [Brother.] Just be quiet about it[.] [Brother] just wants to be able to say bad things." Tina herself recognized that "it was very clear that favoritism was being shown because, you know, if I'm allowed to stay up and my brother's not, that's . . . not fair.

- Parks texted Tina tips to trick the rest of her family into thinking that she was asleep when she was staying up past her bedtime: "I would tell you to go to

9

bed at 2[,] but . . . [Tina] does what she does . . . . Towel at the base of the door as to block the light, and no one will know what [Tina] is up t[o]." Brother confirmed that Parks would even "give [Tina] a towel to put under her door so no light would go in when she was staying up late."

- Tina testified that Parks gave her access to an unmonitored "off[-]chart" tablet and "told [her] that nobody could see what [she] was looking at on there so [she] could look at anything [she] wanted to." Parks's text messages confirmed that he encouraged Tina to take advantage of the lack of restrictions. For example, in January 2018, Parks texted Tina: "Any site on Google you want to see, you could see[.] . . . No restrictions[.] Images, videos and photos[.] . . . [L]ook for things that you would like to . . . receive, save the image for me, and I will see what I can do for you[.] This is my gift to you." Five minutes later, Parks texted again: "[Tina] you are a good kid[.] Problem is, you're not a kid any more[.] I understand that, so enjoy[.] . . . [J]ust let me know and maybe I could order something for you[,] no questions asked[.]"

### b. Pre-Incident Suggestive Messages

In addition to his other grooming behaviors, there was evidence that Parks sent

Tina sexually suggestive text messages in the months before the vibrator incident:

- Parks asked Tina to send him late-night selfies while she was mere rooms away in the house. In one January 2018 message—sent at 1:00 a.m. and not long after Parks had encouraged Tina to explore the boundaries of the unmonitored tablet he had provided—Parks texted, "Selfi[es] would be cool, maybe I will leave the [unmonitored] tablet with you over night [sic] during the week, so you can enjoy some privacy[.] Selfi[es] any time are welcome [Tina]."

- Parks used Tina's innocuous text messages as a means to raise sexual matters. In one exchange, when then-13-year-old Tina requested a fox tail keychain—a furry keychain that she later explained she "clipped on [her] backpack" because she "thought it was cool"—for her birthday, Parks asked her if she wanted a "fox tail or foxtail plug." He told her to "look through images on both" and "see which one [she] like[d]," then he would order it for her. Tina later testified that she had not known what a foxtail plug was, but when she Googled it, she discovered that it was a sex toy.

- Similarly, in April 2018, Parks discovered a clay object in Tina's room. Tina later explained that the object was "a piece of clay that was left over from [her]

10

art project" and "fell off of the original [wolf] sculpture" while the sculpture was drying in a bag. "[B]ecause it was just a roll of clay," she scratched the word "Twinki" on it—running out of room for the letter "e"—and she left it in in her room with the original sculpture. But when Parks found the clay object, he Googled it and concluded that it was a German sex toy. Rather than talking to Tina's mother (Mother) about his discovery, Parks texted 14-year-old Tina and asked, "Twinkie…?" Tina did not respond, and she later testified that she "didn't understand what he was getting at."[4]

- Parks implicitly tied his sexual prodding to offers of money. When Tina did not respond to his text-message inquiry about the "Twinkie," Parks proposed giving Tina a weekly allowance: "A weekly allowance is sep[]arate from [money for babysitting], what would you like weekly for spending money (or saving if you like)[?] A Twinkie[] may be hard to do, but maybe there is something else that you would like." Tina later testified that neither she nor Brother received an allowance at the time, so she found Parks's references to an allowance confusing.

- On another occasion, soon after Parks asked Tina about the "Clay Twinkie," he offered her money and told her not to "tell [Brother]." When Tina did not respond to his text, Parks stated, "You are not a child, and I do not think of you as one[.] I see things with my own eyes . . . . So I give you the space for you to be you, and offer[ing] you an allowance for things that we do not talk about, but we both know exist[.] . . . Clay can be replaced by something that works much better, and if you ask, before school starts, it can be so[.] It just involves trust, and telling me what it is that you really want[.]"[5]

- Parks told the police that, when Tina did not respond to his text messages regarding the clay object, he decided that he would "just go ahead and order something" for then-14-year-old Tina to use for sexual stimulation.

---

[4]Several weeks later, when Tina still had not responded, Parks texted again, "Twinkie…?" Again, Tina did not respond, and she later confirmed that she did not know what he was talking about, explaining, "the reason why [she] never really responded to his text messages [wa]s because they never made sense to [her] at the time."

[5]Again, Tina testified that she did not know what Parks was talking about, saying that the text message "was very long and didn't make much sense to [her] so [she] kind of ignored it as [she] did with everything else."

11

- Even before he gave Tina the lipstick-shaped vibrator, Parks began sending Tina text messages regarding the sexual devices that he had ordered.[6]  In one exchange he told her he had received a package and alluded to its contents: "No twinkies . . . But there is a pocket rocket that should be here [soon.]"  Tina testified that, at the time, she had not known what a pocket rocket was, but when she and Brother Googled it, they discovered that it was a small vibrator.

- About a week after texting about the "pocket rocket," Parks texted Tina about another shipment:  "Two of the orders came in, one cancelled[.]  I will be down town [sic] tomorrow, would you like me to pick up a twinkie replacement[.]  Was thinking bullet, or something small that you could hide or keep hidden . . .  If you are into that, maybe we could talk sometime[.]  That's the neat thing about hidden, it's something private that only a few get to know. . . .  [Y]ou need to be honest as to what you really want[.]"

### c.  Provision of Vibrator

It was within this context that Parks gave Tina a vibrator in June 2018.  Parks texted her—at approximately 3:30 in the morning—to tell her that "[s]ome[thing] did come in the mail, something small that I can not [sic] say, it looks like something quite normal, but it's different in many ways[.]  It could be lef[t] out in the open, but some things are best hidden away."  When Tina asked what it was—later testifying that she did not know what Parks was talking about—he replied "Not a rocket[,] And not a twinkie[, b]ut it does take bat[t]eries[,] I[t]'s small, just take[s] one."  Parks told Tina that "[s]ome other things are on order[,] But I think this would do better than a clay twinkie," and he noted that the package "[l]ooks like lip stick [sic]."  By then, it was

---

[6]Parks told the police that the only sexual device he had ordered for Tina was the lipstick-shaped vibrator.  He claimed that the other sexual devices and lingerie that he had ordered were for his wife.  Parks admitted, though, that his wife did not know about the other sexual devices and that they had not had sex in years.

12

nearly 4:00 a.m., and Parks told Tina that they were "[s]hort on time, [as her] mom [wa]s getting up soon," but "one [was] out [in] the kitchen, battery installed, ready for use[.]" He told Tina to "come on out."

When Tina came out, Parks gave her the lipstick-shaped vibrator. Parks later recounted the incident for police; he told them that Tina initially thought the vibrator was actual lipstick, but he clarified that "this [wa]s something different[,] and [he] kind of showed her . . . what it [wa]s." Although Parks emphasized that he did not expressly direct Tina to use the vibrator, he admitted that he had provided the vibrator for sexual stimulation as a substitute for the clay object he had discovered in Tina's bedroom. *Cf.* Tex. Penal Code Ann. § 43.21(a)(7) (defining "[o]bscene device" as "a device including a dildo or artificial vagina, designed or marketed as useful primarily for the stimulation of human genital organs"); *see Bonner v. State*, No. C14-93-00375-CR, 1995 WL 144347, at *3 (Tex. App.—Houston [14th Dist.] Mar. 30, 1995, no pet.) (not designated for publication) (affirming conviction for promotion of obscene device when defendant displayed vibrators for sale in adult book and video store).

Tina remembered that Parks took the vibrator out of the box, "showed [her] how to turn it on[,] and then . . . put it back in the box." But she testified that she "really didn't know what it was until [she] got back to [her] room and read the box." Brother confirmed Tina's account; he and Tina had been playing video games when

13

Parks texted, so after Tina returned with the vibrator, Brother saw the box. After the

two realized what the vibrator was, Tina "took a picture of it and sent it to [her] dad."

### d. Post-Incident Sexually Suggestive Messages

Parks's sexual text messages did not stop after he gave Tina the vibrator:

- Within minutes of Tina returning to her room with the vibrator, Parks asked "[i]s it working[?]" and he texted that he had "a few other bad things on order."

- A few hours later, around 6:45 a.m., Parks told Tina that he "ha[d] extra batteries, if [she] ever need[ed] them." Again, Tina did not respond.[7]

- Parks continued to send text messages urging Tina to "[l]et me know your thoughts," and noting that she had "never ask[ed] what else came in[,] [or] what more [wa]s still on order."

- More than a week later, Parks circled back again: "A clay twinkie, said it was time for lipstick[.] . . . Kids don't stay young forever, eventually they do grow up."

- And again the following month, Parks sent a message through Facebook: "German Twinkies cost about 38.00 Euro's [sic] and are not available in the US[.] There ar[e] alternatives available, Amazon carries some[.] Most Twinkies are classified as a rabbit, so look up rabbit on Amazon[.] I have more lipstick, i[f] you would be interested[.] . . . I tell no one w[h]at I know." Tina later testified that she looked up a rabbit online and discovered that it was "a different kind of vibrator."[8]

---

[7]She later testified that she "was extremely uncomfortable with the entire situation, and [she] really didn't want any contact with [Parks] after that point because it was disturbing."

[8]Soon after Parks sent the Facebook message, he was interviewed by the police. In that interview, Parks told the police that he had noticed that the vibrator was missing from Tina's bedroom so he "ordered another one . . . in the event . . . that she wanted a replacement."

14

### e. Sexual Attraction to Tina

Adding to this evidence was Parks's admission to the police that, although he was "[n]ot normally" attracted to young girls, he thought "[Tina] [wa]s attractive." When the police detective asked if Parks would be willing to have sex with Tina after she turned 18—assuming Parks's wife were out of the picture and Tina had indicated interest in him—Parks responded that he would "probably not" be willing but that it would be a "tough judgment call."

There was evidence that Parks had manifested his attraction to Tina prior to his discussion with the police as well. Brother testified that, when the family would have dinner, he would notice Parks looking at Tina's chest during the prayer or conversation.[9] And although Parks claimed that he came upon Tina's underwear while he was collecting laundry from her room,[10] Mother, Brother, and Tina all testified that Tina put her laundry in a hamper in the hallway and that Parks had no reason to go into Tina's bedroom.[11]

---

[9]Brother testified that after he "saw [Parks] looking at her . . . it didn't seem very safe" in the house, and when Parks then gave Tina a vibrator, Brother "was in fear that he might do something to either of us."

[10]Parks told the police that Tina was stockpiling dirty underwear under her bed, but Tina explained that, when she was 13 or 14, she often pushed all of her laundry under her bed "just so it wasn't out in [her] room." She testified that she was not keeping her dirty clothing for any purpose; she was simply waiting for laundry day.

[11]Similarly, when Parks found the clay object in Tina's room that he later claimed was a sex toy, Tina was "a little weirded out because . . . that was on or in

15

Taking all of this evidence together and viewing it in a light most favorable to the verdict with deference to the factfinder's credibility determinations, *Queeman*, 520 S.W.3d at 622, a rational juror could have found beyond a reasonable doubt that Parks's provision of the vibrator—which was accompanied by Parks's sexually suggestive messages and which came after Parks had exhibited grooming behaviors— was an act that tended to "endorse, empower, . . . permit," or "influence" Tina to engage in masturbation. *See Authorize*, Webster's Third New International Dictionary 146 (2021); *Induce*, Webster's Third New International Dictionary 1154 (2021).

In fact, Parks himself inadvertently concedes as much. Although he challenges the sufficiency of the evidence to support this implied jury finding, in a separate portion of his appellate brief, Parks acknowledges that "[t]here was . . . evidence on the record of Parks's intention to allow [Tina] to masturbate" including "Parks t[elling] the detective that he knew the device was for masturbation and he provided it to [Tina]." We agree—the evidence was sufficient.

We overrule Parks's first issue.

## B. Even if preserved, the admission of Parks's interview was harmless.

Parks next contends that the trial court abused its discretion by refusing to exclude certain portions of his video-recorded interview with police. Specifically,

---

[her] desk, and it's not a very noticeable thing to see just standing in [her] room," so to find it, Parks would have had to have been looking around her bedroom.

Parks takes issue with a two-minute-and-thirteen-second segment of the interview in which he responded to a police hypothetical:

Detective:     Say you wake up and it's working great and [Tina]'s 18 years old and she tells you that she's interested in sex. Is that something that's okay? That you're . . . open to if, I mean, take your wife out of the picture . . . you're divorced . . . is that something that you're willing to do?

Parks:         Probably not.

          . . . .

Detective:     And not definitely not? Because, I mean, most normal adults would say "he[ck] no I don't want to sleep with my daughter."

Parks:         One, she's not my daughter. But . . . . no that'd . . . be something I probably wouldn't do because of the age difference. Uh, I've discussed that with a lot of people before on the internet . . .

          . . . .

Detective:     Have you slept with young children?

Parks:         No.

Detective:     Okay. Would you like to?

Parks:         No.

Detective:     Just your stepdaughter that you find attractive? . . . . Maybe eventually when she's 18 cause you only probably don't want to have sex with her?

Parks:         You know that – I'll be honest with you that's a tough judgment call and stuff but I'd like to think that ya, no, I would not do that.

17

Detective:  It . . . It's not a tough judgment call, man. . . .  If you want to have sex with your daughter you've got problems, and clearly you've got some kind of issue that you need to work out.

Parks:  Ya.

Parks claims that this two-minute-and-thirteen-second excerpt was inadmissible because "[w]hether or not Parks would have sex with [Tina] four years in the future under a host of speculative circumstances . . . [did not] make it more probable that he intended to induce her to masturbate."  Plus, Parks contends, the video excerpt created the impression that Parks was a sexual deviant, and it suggested that the jury should punish him for his "strange inclinations."  This argument fails on multiple fronts.

First, to preserve a complaint for appellate review, "the point of error on appeal must comport with the objection made at trial," *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014); *see Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995), and Parks did not object to the full two-minute-and-thirteen-second segment at trial.  Although Parks objected to a portion of this segment, his objection appears to have covered only one minute and thirteen seconds of footage.  The trial court twice clarified as much—it noted the specific time stamps for the objected-to segment when it ruled on the issue before trial, and it confirmed the time stamps again when the State sought reconsideration of the pretrial ruling in a hearing outside

the jury's presence. The time stamps referenced by the trial court encompassed only one minute and thirteen seconds of footage.

Parks challenges the trial court's ruling on appeal, but he now claims that the objectionable video segment spans two minutes and thirteen seconds. His appellate challenge is only preserved to the extent that it comports with his objection in the trial court. *See* Tex. R. App. P. 33.1(a)(1); *Broxton*, 909 S.W.2d at 918.

To complicate matters further, it is unclear which portion of the two-minute-and-thirteen-second video segment was objected to in the trial court. The video was converted into a different file format when it was admitted into evidence, so the pre-conversion time stamps noted by the trial court and referenced in Parks's trial objections do not map to the post-conversion copy of the video that is contained in the appellate record.[12] Thus, although one minute and thirteen seconds of Parks's challenge was preserved for appellate review, he has not provided this court with an adequate appellate record to determine which one minute and thirteen seconds that is. And "[t]he failure to provide a sufficient appellate record precludes appellate review of a claim." *London v. State*, 490 S.W.3d 503, 508 (Tex. Crim. App. 2016).

Regardless, even if Parks's challenge to the full two-minute-and-thirteen-second segment had been preserved, even if the appellate record were sufficient to confirm

___

[12]We reviewed the original video exhibit admitted into evidence, and that exhibit matches the version of the video included in the electronic appellate record.

preservation, and even if the trial court had erred by failing to redact the segment, the error would have been harmless.

"[T]he improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged." *Redmond v. State*, 629 S.W.3d 534, 547–49 (Tex. App.—Fort Worth 2021, pet. ref'd) (quoting *Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998), and holding that admission of officer's hearsay testimony was harmless because the same facts came in through other witnesses and exhibits). Here, the trial court's admission of the challenged segment—in which Parks stated that, hypothetically, he would "probably not" sleep with Tina when she turned 18—was not harmful because the same facts came in through Parks's reiteration in a later, unchallenged portion of the video that "if the question is would I sleep with her, probably not, no."

And again, Parks inadvertently concedes this point. In his brief, Parks downplays the probative value of the two-minute-and-thirteen-second video segment by contending that "[t]here was already evidence on the record of Parks's intention to allow [Tina] to masturbate," and "[t]he jury could infer that Parks had an intention to induce [Tina] to masturbate from the numerous other statements made by Parks." Again, we agree—even without the challenged two-minute-and-thirteen-second excerpt, the jury could have inferred Parks's intention to authorize or induce Tina to masturbate based on Parks's numerous other statements, including the equivocal nature of his unchallenged reiteration that he would "probably not" sleep with Tina.

20

Because Parks's challenge to the video was only partially preserved, because he has not presented a sufficient appellate record for us to determine which part was preserved, because any error in the admission of the challenged evidence was harmless anyway, and because he concedes the harmless nature of the error, we overrule his second issue.

## C.    Section 43.25 is not unconstitutional as applied to Parks.[13]

Finally, Parks argues that the sexual-performance statute—Penal Code Section 43.25—is unconstitutional as applied to him because it infringes on his right as a stepfather to make child-rearing decisions. *See* U.S. Const. amend. XIV;[14] *cf. Troxel v. Granville*, 530 U.S. 57, 65–66, 120 S. Ct. 2054, 2060 (2000) (plurality op.) (summarizing "extensive precedent" protecting parental rights and stating that "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children").

---

[13]Parks also argues that the legislature did not intend for the sexual-performance statute to be applied to cases such as this one. Parks claims that the sexual-performance statute was intended to punish those who use children for pornographic purposes—not to punish stepparents. But as the State points out, "[w]hen interpreting criminal statutes, courts focus on the plain language of the text, for that is the foremost indication of legislative intent." *State v. Mays*, 967 S.W.2d 404, 408 (Tex. Crim. App. 1998) (quoting *Hines v. State*, 906 S.W.2d 518, 520 (Tex. Crim. App. 1995)). Because Parks's offense is within the plain language of the sexual-performance statute, it is within the intended scope.

[14]Parks also cites the Fifth Amendment Due Process Clause. *See* U.S. Const. amend. V.

"An as-applied challenge to the constitutionality of a law asserts that the law is unconstitutional as it was applied to the Appellant's particular facts and circumstances." *Ex Parte Shires*, 508 S.W.3d 856, 861 (Tex. App.—Fort Worth 2016, no pet.). Parks frames his particular facts and circumstances as having purchased and provided a vibrator for legitimate educational and medical child-rearing purposes. But as the State points out, the jury rejected this factual theory when it rejected Parks's affirmative defense that he had provided the vibrator for a bona fide educational or medical purpose. *See* Tex. Penal Code Ann. § 43.25(f). Therefore, we overrule Parks's third issue.

### III. Conclusion

Having overruled Parks's three issues, we affirm the trial court's judgment. Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 2, 2023